May it please the Court, in its ruling and order regarding Targa's motion for summary judgment, the District Court concluded the appellee's refusal to participate in diluting the sewage samples was a protected activity under the Louisiana Environmental Whistleblower Statute, which I'm going to refer to as LEWS. To support its conclusion, the District Court relied upon the Louisiana Supreme Court case Sheramy v. J. Wayne-Plessence. The District Court's reliance on the Sheramy case is misplaced for two reasons. In Sheramy, the Louisiana Supreme Court did not analyze the current version of LEWS. It analyzed the pre-1991 version. Secondly, there is no language in the current version of LEWS that protects refusals amounting to complaints like the language the Louisiana Supreme Court found in the pre-1991 analysis. So should we certify the question to the Louisiana Supreme Court? I don't think you have to, Judge Haynes, the reason being I think the language is clear and the way you can interpret it is based on the intent of the legislature, and I think it's clear under the current version. The current version of LEWS protects an employee who discloses or threatens to disclose to a supervisor or public body a practice which the employee believes violates an environmental rule, regulation, or law. The Louisiana precedent is clear. It states that the purpose of LEWS is to protect employees from retaliatory action by employers for reporting possible environmental laws. In this case, Mr. Menard refused to dilute the water samples. Now, Mr. Menard did make a report to his supervisor, David Smith, that he was asked to dilute the water samples, but the district court in that same opinion and summary judgment found that LEWS did not afford protection to an employee who generates reports regarding environmental issues or reporting environmental issues, concerns, or violations as a part of one's person's duties or responsibilities. And so based on the precedent in stone in the English cases, the court found against that. So we're only before you today regarding the interpretation of LEWS because of the appellee's refusal to dilute the sewage samples. Now, the starting point of interpreting any statute is the language of the statute itself. Here, it's clear the statute says disclose or threaten to disclose a violation of environmental rule, law, or regulation. When the appellee told Mr. Berthelot that he was refusing to dilute the water samples, he was not disclosing or threatening to disclose anything. And the reason, Your Honors, that I say that the intent is clear with this legislature is because if you look at the general whistleblower statute under Louisiana law, it states very clearly that a refusal to participate would be a protected activity under that statute. It goes on to say, and they use the same language they used in LEWS, they say that the Louisiana whistleblower statute prevents an employer from taking reprisal against an employee who in good faith and after advising the employer of violation law to disclose or threaten to disclose a workplace act or practice that is a violation of state law. They also say in number two that if you go and participate in an investigation before a public body, that's a protected activity. And then finally, number three, under the general whistleblower statute, it says to object or refuse to participate in an employment act. This is not found in LEWS. So if you look at the plain language of LEWS, the only thing that is found is to disclose or threaten to disclose. Relying upon that plain language, Your Honors, the district court erred when it concluded that the appellee's refusal to participate in the dilution of water samples is a protected activity, and on that basis we ask to reverse and render. We also have a second point, that the district court was clearly erroneous in concluding the appellee's protected activity was the but-for cause of his termination. To determine when an adverse employment action occurred as a result of retaliation, the court's focus must be on the final decision maker. If the final decision maker was unaware of the plaintiff's protected activity, then it is an initial matter that the decision maker might have been retaliating against the plaintiff for engaging in that activity. In this case, Jessica Kaiser, the vice president of the ES&H group, was the final decision maker, and it is undisputed that Ms. Kaiser, as the final decision maker, was not aware of Mr. Menard's protected activity, the refusal to dilute the water samples. In its ruling, in order following the bench trial, the district court relied heavily on the cat's paw theory to establish the causal connection. To satisfy the cat's paw analysis, the appellee must establish, submit evidence satisfying two conditions, one, that a coworker exhibited retaliatory animus, and two, that that same influence over the decision maker. In this case, it is undisputed that there was only one person who carried a retaliatory animus against the appellee. That was Mr. Berthelot, the gentleman who he refused to dilute the water samples. He did not tell, Mr. Menard did not tell anybody else that he refused to dilute the water samples. So the only person we have is Mr. Berthelot with retaliatory animus. It's also undisputed that Jessica Kaiser, as the final decision maker, did not speak to Mr. Berthelot at any point in time prior to making the decision to terminate. In fact, Mr. Berthelot wasn't even involved in the decision making process to terminate. What happened was, there were two employee complaints. Is there a requirement that the cat's paw be direct, or can it be flop, flop? No, I agree with you, Judge Haynes. It can be flop, flop, but there's got to be something, right? You can't just have, and that's one of the contentions we're making in this case, Your Honor, is the way that the court has gone flop, flop with the cat's paw analysis is, I believe, based on three facts. Number one, that Mr. Berthelot was a direct supervisor of a gentleman by the name of Ted Keller who he said orchestrated or put the things in process to start the termination up to the decision maker. The second point is the fact that they had the ability to speak between the time of the protected activity and the termination. And then the final fact I think the court relied on in his ruling was the fact that Mr. Keller went to Mr. Berthelot and told him that he was going to go to HR with some inappropriate complaints he received about Mr. Menard. Those are the three facts. Putting aside, Your Honor, the last fact, I don't think you can even conceivably say that the last fact could establish a cat's paw because Mr. Keller had already made a decision to go to HR, but the inappropriate comment or actions that he learned from two other people regarding Mr. Menard. So and there is no evidence Mr. Berthelot spoke to Mr. Keller before that day. So we're down to two facts. So we're down to simply for the plop, plop. We're down to simply of they're in a direct chain of command with one another and then also that they had the ability to talk between the time of the protected activity and termination. If you were to decide that way, Your Honors, as precedent going forward, a plaintiff in a case where the final decision maker is unaware of the retaliation activity, all they would have to establish is two simple facts. Do you fall within the chain of command of the alleged bad actor? And then also, did you have a chance to talk to him between the protected activity and termination? And as you all know, that sometime can be months or years. In this case alone, under Mr. Berthelot's chain of command at the Venice facility were 39 different individuals. If you were to find the precedent the way the court has laid out in this case, as long as Mr. Berthelot had the ability to speak to any of those 39 individuals, his retaliatory animus could have been plop, plopped into any of those 39 individuals. What's interesting is that Mr. Keller was that the judge goes to great lengths to talk about the causal connection and the chain was not broken from Mr. Berthelot all the way up to the chain of Ms. Kaiser. Now, keep in mind that it went from Mr. Keller to HR folks to legal, then to Ms. Kaiser. It wasn't just straight up to Ms. Kaiser. And what the judge relied on is that Mr. Keller orchestrated the termination based on those two facts of Mr. Berthelot. And so the chain was not broken. But what's important, Your Honors, is the fact that the chain didn't start at Mr. Keller. The chain started when Mr. Keller received a report from an employee by the name of Keith Adams regarding the inappropriate stuff and also an independent contractor by the name of Tony Williams. That is where the chain of causation starts. It did not start with Ted Keller. In relying upon the Wagoner v. City of Garland case, Mr. Keller had a good faith belief. The testimony is that he had a good faith belief on the complaints that he received from the employee and from the independent contractor. How does that all fit in in the final analysis that said it terminated him because of job performance? So this inappropriate conduct and the other things, you know, don't factor into whatever went to HR and the final decision maker. That's one question. And my second question is, did Mr. Kaiser, Berthelot, and Keller, did they all testify at trial? Yes, they did, Your Honor. To answer your second question, all three testified at trial. But if I could go back to your first question, Your Honor, yes, there was when he was told he was terminated during the telephone call with HR and one of his supervisors, he was told he was fired for overall performance. And the HR person came in and testified to the fact that overall performance meant overall everything, not just job performance. And Mr. Menard testified that he knew that he was fired both for performance and inappropriate conduct. And if you look at the court's ruling, he even says that Mr. Menard showed that picture, that inappropriate picture of his wife, to one of the employees during work time. So they found that the court found that he actually did that act, and it's in his ruling. What's interesting, though, is that Mr. Menard testified that he knew that Target had a harassment policy, that he knew that he could be fired for a single violation, and he also knew that if he showed a picture like that, that that would be a violation of the policy and that he could be terminated for that single offense. Getting back to the Wagoner case, Your Honors, is the fact that Mr. Keller, who was not the start of the chain, but the fact that Mr. Keller had a good faith belief. In employment lawsuits where an employer decides to terminate an employee based on his violation of a particular rule or policy or receives complaints about a particular employee's conduct or behavior, the validity of the initial complaint is not the central issue because the ultimate So that would go to Mr. Adams and Mr. Williams at the beginning of the chain. This court did not even consider the good faith basis of what Mr. Keller had. All he said was that nobody, nobody in the chain from Mr. Keller forward conducted any investigation whatsoever. And so therefore, the chain of causation was broken because under his theory of the two facts of being able to talk in the chain of command, the chain went from Mr. Berthelot to Mr. Keller. The facts are undisputed that the chain started with those two employees and Mr. Keller had a good faith belief. So based on their inability to establish the Katz-Paul analysis, and Your Honors, I will tell you that I could not obviously find a Fifth Circuit case that had the plot plot that Judge Haynes was talking about with regards to facts similar to this. But I will tell you there was an Eastern District of Louisiana case, which is Peters versus they tried to attempt to do the plot plot. And what happened was the employee to establish the Katz-Paul said, hey, although the decision maker didn't have a retaliatory animus and the person who started the whole thing didn't have a retaliatory animus, the person who had the retaliatory animus was the direct supervisor of the person who started it. And she testified the fact that, well, he had access to the personnel file, so he must have known that I made a report and tried to impute the retaliatory animus into that. And the court said, no, that was too attenuated to suffice for a Katz-Paul analysis. And that's exactly what we have here. The fact that they just had a chain of command and the fact that they had the ability to talk, there's not even evidence that they did, that is too attenuated to have that flow all the way up. Because typically what we find in the Katz-Paul cases is that the person with the retaliatory animus is somewhere in the decision to terminate, typically. And you find that that flowed up to the decision maker and that's how they can attach it. We do not have that here. Mr. Berthelot undisputedly was not involved in the decision making process. And in fact, everyone in the decision making process who testified said that they didn't even speak to Mr. Berthelot before either recommending termination or when Ms. Kaiser made her final termination. So based on that, your honors, we believe that the court was clearly erroneous when he made the decision regarding that the protected activity was the but-for cause of the appellee's termination. And if you don't have any other questions, I'll sit down. All right. Thank you, sir. Thank you. You've reserved your rebuttal rights. Mr. Simeon? Good morning, Your Honors. May it please the Court. Just to point out that we don't agree there's only one issue before the Court relative to the protected activity in this case. We certainly do agree that the district court did find, based on the facts, and not just the two or three facts that Target wants to talk about. Target wants to, what Target wants to do is divide and conquer the facts in this case because they think they can attack those facts on an individual basis rather than look at the totality of the facts that the district court looked at in this case. The district court did not rely simply on the three things that were stated here. The district court found that Mr. Keller was not credible. So that good faith belief that Target wants to argue about was rejected by the district court because the district court found his excuses were not credible as to why he was doing what he was doing. So you can't say he started it independent. The district court rejected that testimony and did it for good reason because as you look at the facts of this case that the district court relied upon, Mr. Keller was contradicted by every one of the single employees that he claimed reported these things to him. He was contradicted as to when it was reported to him, including he said it was reported to him before he started this process, yet the person who was affected, the one who allegedly saw this picture said, I didn't tell that to Keller until two weeks later. I have no idea how Keller got that information, though Keller claims he got it from the person who supposedly saw the picture. So the court just found that was incredible, not believable, not just based on those three testimonies from every single Target employee who testified about what transpired in this particular situation. And we can't reject that credibility finding by the court. Secondly, Your Honors, the other point that is before this court, because we are dealing with a district court that has rendered an award in this case, this court can affirm that award even if it's not on a basis that the district court used, but if it's supported by the law. Target concedes under the language of the law that Mr. Menard did in fact tell his supervisor. He disclosed to his supervisor, to use the term that the law currently uses, he disclosed to his supervisor this request by Mr. Berthelot, okay? And it also, but it rejected that claim based on a finding that because it was part of Mr. Menard's duties to have made such a report, that that would not be protected conduct. And I'll get into why it is that was an erroneous finding by the trial court. And by the way, that summary judgment was denied by the court. It simply made a passing comment about that in the summary judgment. It denied the summary judgment that had been brought by Target and made that passing comment. And of course, in its final opinion, it did not endorse this provision, this interpretation of the provision that I'm telling you, but if this court could in fact affirm the trial court's decision based on this alternate basis, then this court can also do that as well. So there are really two bases upon which to affirm. Well, and you said alternatively we can or should certify to the Louisiana Supreme Court. So what is your thinking on that? Well, this is my thinking on that, Your Honor. If you take a look at this big change in the law that Target wants to rely upon, it says, well, the law doesn't say anything about refusing to do the work. Well, at the time the Cherami case was decided, the law didn't say anything about refusing to do the work then either. The law didn't say disclose. What the law at that point said was either reports or complaints. And from those words, reports or complaints, the Louisiana Supreme Court found that that includes refusal. Certainly, if reports or complaints includes refusal, discloses includes refusal as well. That was not an effort to narrow this. There's absolutely no evidence that changing the words from reports or complaints to discloses is an effort to narrow this. In fact, since the time that the Cherami case was decided, there have been numerous appellate court decisions in Louisiana that still say that we have to broadly contribute the statute. And in fact, there are numerous appellate courts in Louisiana under the new version of the statute that say there was a violation because this employee was retaliated against because he reported a complaint. I guess I'm wondering about asking Louisiana Supreme Court just because Louisiana is a state. And so while obviously any state has to carefully construe statutes, it's even more true here. So the notion that you can just invent something for a statute does not seem consistent with Louisiana law, but the Louisiana Supreme Court is much more knowledgeable about that than I am. I certainly do not speak for my colleagues. They're knowledgeable about everything. But as far as interpreting Louisiana law, isn't the Louisiana Supreme Court the best place for that? I would not say that about you either, Your Honor, or your esteemed colleagues. But I do agree. And that's one of the reasons we asked that this matter be certified to Louisiana Supreme Court. There is extant Louisiana jurisprudence. There was a minor change in the statute, in the wording. But it was not a change in the meanings of those words. One was reporting complaints. It now says discloses. In fact, discloses is even broader than reports of complaints. And so we believe that the Louisiana Supreme Court would be an appropriate avenue. However, first off, we would take the position that based on the extant Supreme Court jurisprudence that this Court should simply affirm. But if you're not inclined to affirm and have that question, then certainly certification of the Louisiana Supreme Court would be appropriate. If it is certified to the Supreme Court, Your Honors, I would suggest that it be two questions certified. One, this question, but secondly, the question of whether or not under Louisiana law that an employee whose duty it is to make these reports or make these complaints is also protected. Because there has been some, there's some older case law that indicates that that would not, that employee would not be protected. However, the most recent statement by the First Circuit Court of Appeal rejects that older case law and says that that older case law was based on some previous, which has now been amended to eliminate that requirement. And the case now says, the Darebone case, D-E-R-B-O-N-N-E, I believe, says that what you have to do now is even provide that protection to employees whose duty it is to make those reports. So that would be the two questions, because that would be the alternative basis upon which to affirm the trial court's award in this particular case. So there's two bases there, Your Honor. Of course, there's no guarantee if we did that they'd accept it. They could just decline, send it back, and say, see, share me. You know, they've done that recently, not accepted the question and just said, see this opinion. But anyway. Well, if they said, see, share me, that would give us some answer, wouldn't it? I would agree that it would. And in fact, I believe, see, share me now is the real, is the answer. But obviously, the Supreme Court wouldn't say that that would give you some. If they said we're not going to accept it, see, share me, to me, that's pretty clear. Well, follow that case. It hadn't changed by the new statute or the revision statute. Right. And in fact, our first position, Your Honor, is that that is still true today. That minor change in the wording of the statute to use a broader word, disclose, as opposed to the words report or complain, was not intended to change the, in fact, to make it clear, and we did cover this in our brief, that change in the statute was not a reaction to share me. That change in statute came before the share me decision was rendered, but share me was simply interpreting the previous law. So it wasn't a response by the legislature. So it's not like you can get this idea, well, legislature saw what the Supreme Court did and so they changed the statute. That's not what happened. The statute was already changed before the share me decision was rendered. And that change was a minor change from reports or complaints to discloses. That's the only change in the statute. And that's not sufficient to override what the Supreme Court has already said. But certainly, you could send it to the Supreme Court for those two questions, we would suggest. So what is your view of the variety of cats that are all pawing each other as your opponent contended? The cats. The cats paw, but it ain't just one cat. It's a bunch of cats pawing each other and then the final, I don't know, tiger that got pawed. Yes, Your Honor. Our view is once again, to begin with, Mr. Keller was not in good faith. The trial court rejected Mr. Keller's good faith when it said his testimony was not credible as to what his reasons were for the termination. Now, relative to the other question, is relative to whether or not we can get Mr. Berthelot's animus up the chain, the bloppers, I think the word was used. And yes, we can. Again, it was not just the three elements that the trial court was looking at when it concluded that Mr. Berthelot, in fact, passed on that animus to Mr. Keller, who was his direct report, I think is the term they used. Because you also had, which are relevant factors not only to whether there's a prima facie case, but a relevant factor for the court in evaluating all of this evidence, you had this close proximity. We said it was six days between this alleged act and the termination. Actually, it was only four days before the decision to terminate was made or the process was begun. And so that was such a close proximity. There was substantial disagreement between Mr. Keller and what the people he supposedly was relying upon had to say about what really transpired. The person who saw the picture said, I never told that to Keller, though Keller says, yeah, he told me that. That's what got me started on this. And so that question of his credibility not only goes to the question of whether he somehow was not telling the truth about the reasons for the termination, but the district court can evaluate that as well in evaluating his denial that Mr. Berthelot, in fact, asked him to do this. Take a look at Mr. Berthelot's testimony. Again, Mr. Berthelot claims nothing like this has ever happened to him before in his whole life, yet he couldn't remember if he had been told that when the investigator asked him about it, he couldn't remember whether or not he was told that someone accused him of having asked that the water be diluted. The trial court found that incredulous, because it is. The testimony relied upon by Targa is incredulous, and therefore all of that goes into that question of whether or not we can do the blop-blop that we talked about. It's not just the three things that Targa wants to talk about. Now let's take it from there all the way up to the ultimate decision maker. Well, when you take a look at this Katz-Parr theory, certainly the court did make the statements, and I think Judge Stewart, you were one of the judges on that Robertson case, that you have to prove those things. However, we don't say that Robertson is no longer good law. It was a statement in that case about one of the bases upon which the Katz-Parr theory applies. But if you take a look at other statements, that was just one of the statements from this court. You can take a look at the Sepora case, and that particular case that applied the Katz-Parr theory, where there was not a, you have to look to whether or not the person who ultimately makes the decision acts in good faith. And what do you need in order to have good faith? You can't simply rely upon the person that the trial court concluded had this transfer unanimous. You can't just rely on what Mr. Keller had to say, point blank, blind rely on it. It has to be a reasonable good faith. And what this court has required in order to have a reasonable good faith is there be some verification, some investigation, some look. But every single person up the chain at Target does what? Well, Mr. Keller said it, so it must be true, which obviously the district court disagreed with. Mr. Keller said it, so it must be true. So we did nothing, nothing at all to verify what Mr. Keller was saying. And in that sense, what is happening is the person with animus then uses the ultimate decision maker, and that animus is somewhat under the law transferred to the ultimate decision maker because they are blindly accepting what this other individual said without any review of it at all. I'm looking right now for a quote that I want to give to you from the Zamora case, and it says the following. In every case involving cat spa theory of causation, the ultimate decision maker bases his decision on a non-retaliatory reason because if they had a retaliatory reason, you'd have to worry about cat spa. Indeed, that is why the cat spa analysis is needed. The plaintiff cannot show that the decision maker harbored any retaliatory animus. But because the supervisor caused that decision through actions motivated by retaliatory animus, in effect manipulating the decision maker into making what appears to be the decision make, in taking what appears to be the decision maker to a non-retaliatory action, the employer is liable. The court found that because that, and what it did in that case was look, in the Zamora case, looked at the fact that the decision maker simply accepted at face value without any review, without any confirmation of what was said. Now, so how did that happen in this case? Mr. Keller went to HR. HR said, we just accept what Keller says. Went through legal, went to the ultimate decision maker who said what? Well, I assume that HR did the review. I don't think that HR would have just relied on what Keller said. Well, the testimony from HR was we just relied on what Keller said. So she was acting under the mistaken impression. So was she, did she believe what she said? I can't say that she didn't believe what she said was the reason for the termination. However, I can tell you it was not a good faith belief, which is what this circuit requires. And so because it was not a good faith belief in reliance upon Mr. Keller, that is why the cat's paw theory applies in this case. Are there any other questions? Now, let's talk about this other question that we think is an alternative basis in addition to potential certification of the Supreme Court, this other question of whether or not there is another basis to affirm the trial court's opinion in this case, this conclusion in this case. And this court, this circuit has on numerous occasions said that's what can be done. In this case, the trial court, in our view, erroneously concluded that because Mr. Menard was in fact an employee whose duties included reporting of such activity, that he would not be protected under the statute. It did so in reliance upon a district court opinion out of the Eastern District, if I recall correctly, that had made that conclusion. And that Eastern District opinion was based on some Louisiana jurisprudence as well. However, more recently, the First Circuit has rejected that approach. Now, as Target points out in their brief, the First Circuit didn't overrule the case. No, it didn't use that magic word, overrule. But what the First Circuit did, unmistakably do, is to reject that earlier line of cases. And in that earlier line of cases, they had relied upon some older federal cases that have now been legislatively overruled, but they relied on some earlier federal cases interpreting federal law. And so it said we ought to interpret state law in the same fashion. The First Circuit says, well, no, our state statutes have a different purpose. We have to read them broadly, as the Supreme Court in Sheramine said, which obviously wasn't changed by the wording in the statute. Read them broadly, and when you read them broadly and look at the purpose which mandates that we try to protect the environment, you're going to not only protect those whose duties do not include the obligation to report,  So we believe the trial court erred in rejecting that, although the facts were there. The target conceded to this court that Mr. Menard, in fact, told his supervisor. And if you go with that, it falls directly within the statute that he told his supervisor, he reported it to his supervisor, he disclosed it to his supervisor, he used the current terminology of the statute. And the only reason we've rejected it was because of that misapplication of the you don't protect people whose duties are included. So we clearly think that when you look at all of the facts here on it, not just the three things, and look at everything the trial court was doing in this case, it clearly had a basis to find that there was a flow from not only Berthelot, not just because of those three facts, but all those facts, including the disbelief of the testimony by both of those two individuals, because of the incredulous nature of some of the things they had to say. Disbelief that they didn't talk about this. The inconsistencies between Mr. Keller and the people that supposedly had these complaints about Mr. Menard. Look at all of those things that have flowed from those individuals directly up to the final decision makers, because nobody was in good faith. They believed, if you accept their testimony, they believed it, but they're not in good faith, because they did absolutely nothing to verify what was being told to them by Mr. Keller. And therefore, that animus is legally transferred to them. Thank you, Your Honors. Back to you, Mr. Patton. Thank you, Your Honors. I want to get right into one thing I disagree with, what my opponent said. The court did not find Mr. Keller not credible. What the court found was the decision, the actual termination decision by Targa not to be credible. And that's important, because everything that you heard about from my opponent was he didn't believe this, that this person had a different story and all that. That all goes to the decision, right? That all goes to the termination decision. You still have to establish causation. You still have to establish that the protected activity was for a cause of the termination. You can have a discrimination case where you have a terrible decision. That doesn't mean someone discriminated against that person based on their protected class. And that's what we're here about. When you have a- I hear you have that very close in time, which I realize may not be 100% determinative, but it's very significant. When, you know, so if you insulted Mr. X and then you were fired three years later, that's different than if you insulted Mr. X and you were fired the next day. I mean, it's just a different analysis. I get that, Your Honor, and I respect that. However, with regards, you've got to understand the dangerous precedent we're having here with the cat's paw theory. Is there is no evidence to get the retaliatory animus out of Mr. Berthelot's head into Mr. Keller's head. There's no evidence. That is why I brought up those three facts, Your Honor, because there is no other evidence where you can make that leap of logic, where you have the animus going from Mr. Berthelot to Mr. Keller if they don't even speak.  Anytime you have a case where you have a final decision maker that doesn't have retaliatory animus, they have to establish causation, and the way you do that is through the Supreme Court's cat's paw. What about if the testimony is, oh, we didn't speak. You know, that look might make you think, oh, yeah, you did. I mean, that's the thing with trials. The words sometimes are a little different from how things come across. I understand. So we don't know how that looked. We just have a cold transcript instead of the vision or kind of shaking or kind of looking around or whatever. Oh, I didn't talk to anyone. That's different from I did not talk to anyone. So those two looks are quite different, and you believe one and not the other when I said it. I understand, but we have to go based on what the court's finding the facts are, right? And in his finding the facts, he talks about those three pieces of evidence that I spoke about. The fact that they were in the same chain of command. The fact that they were, they had the ability. He didn't say they talked, but they had the ability to talk. And then finally, the fact that they did talk on October 9th when Mr. Keller had already made the decision to go forward. So if you find in this Katz-Paul analysis, you are going to show that a retaliatory animus can just jump from one person to the other based on a chain of command and also based on the fact that they had the ability to talk. That is too attenuated of a causation leap, your honors. You just can't, like I said in this case alone, Mr. Bertholdt had 39 people in his chain of command at that plant. If he talked to them in those four days, boom, that's 39 different people who have retaliatory animus. That is what you're going to be saying on this opinion. And I want to real quick touch on the report that my opponent brought up with regards to the protected activity. The case he's relying upon is only regarding the general Louisiana whistleblower statute. There are three cases, including one out of the First District of Louisiana, that specifically talk to a report by someone whose duties and responsibilities is to report is not a protected activity under loose. So he's trying to change established precedent. We have the Stone case. We have the Matthews versus military. That's out of Louisiana First District. And it didn't overrule that. So I think that is well-settled law. I don't think that needs to go up to the Supreme Court. And I think you can do it. And then based on the refusal, Your Honors, I get that the Cherimay case is out there. But they changed the language. And as I said, if you just look to the general whistleblower statute, they put those things in there. In fact, they added two things. Participating with an investigative body. And then secondly, object and refuse to commit the violation of all. That's specifically in the statute. So the legislature knew they could do it. Because the very first protected activity in the general whistleblower statute is to disclose or threaten to disclose. It's the same language. So they knew they could have put it in and they chose not to. That was the intent of the legislature. So if you construe the statute as written, refusal is not in there. And we ask that you reverse and remand. And I appreciate your time today. I forgot to ask, are there any time sensitivities in this case? I mean, it's back to this earlier question about certification. I mean, are there any particular time sensitivities? I don't think so. All right. OK, that was just a curiosity question given the nature of things. All right, thank you both sides for the briefing and the argument. All right, we'll call up the fourth case, consolidated 22-3091 and 22-30559.